# United States Navy–Marine Corps Court of Criminal Appeals

Before
KISOR, GANNON, and FLINTOFT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Joel M. FULSOM**
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

**No. 202500166**

_____

Decided: 29 May 2026

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Eric A. Catto

Sentence adjudged 6 December 2024 by a general court-martial tried at Joint Base Pearl Harbor-Hickam, Hawaii, consisting of officer members. Sentence in the Entry of Judgment: reduction to E-1, confinement for 45 days, forfeiture of all pay and allowances, and a dishonorable discharge.[1]

---

[1] Appellant was awarded two days of judicially ordered confinement credit as a result of an Article 13, UCMJ, violation.

For Appellant:
*Lieutenant Commander Meggie Kane-Cruz, JAGC, USN*

For Appellee:
*Captain Jacob R. Carmin, USMC*

Judge FLINTOFT delivered the opinion of the Court, in which Senior Judge KISOR and Judge GANNON joined.

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

FLINTOFT, Judge:

A general court-martial comprised of a panel of officer members convicted Appellant, contrary to his pleas, of one specification of attempted sexual assault of a child, and one specification of attempted sexual abuse of a child involving indecent communications, both in violation of Article 80, UCMJ.[2] The convening authority took no action on the findings or sentence.

Appellant asserts the following error: the evidence is legally and factually insufficient to sustain Appellant's convictions because Appellant was entrapped. We find no prejudicial error and affirm.

## I. BACKGROUND

At the time of the offenses, Appellant was a 19-year-old servicemember and had recently reported to his unit at Marine Corps Base Hawaii, Kaneohe Bay. Appellant joined an adult online dating application, "Hey, I Like You (HILY)," and on 20 May 2023, the program's algorithm subsequently matched his profile with "Chloe." Unbeknownst to Appellant, "Chloe" was a fictitious profile managed by an undercover law enforcement officer, Special Agent (SA)

---

[2] 10 U.S.C. § 880. After findings, the military judge ruled Specification 2 (attempted sexual abuse of a child involving indecent communications) of the Charge was an unreasonable multiplication of charges with Specification 1. The military judge conditionally dismissed Specification 2 without prejudice, to ripen into prejudice upon completion of appellate review where findings and sentence have been upheld.

M.B., Army Criminal Investigation Division (CID), as part of an online sting operation designed to find servicemembers seeking sexual activity with minors.

This sting operation, known as Operation Keiki Shield-18 (OKS-18), included agents, known as "chatters," who operated in an online undercover capacity and specifically "trained in speaking with persons online."[3] SA M.B. operated as the chatter for the "Chloe" persona across multiple online dating platforms, including HILY. Although SA M.B. adopted the role of "Chloe," a 14-year-old-girl, the HILY profile listed "Chloe's" age as 18 years old.

The visual representation of "Chloe's" profile included three images of a "decoy" persona. Army CID SA E.W., aged 28, served as the decoy for "Chloe," utilizing photographs of herself altered with an age regression filter to project a younger appearance. Along with the photographs, the profile's general biographical information included her age listed as 18; a location listed as Schofield Barracks, Hawaii; a preference for a short-term relationship; and occasional alcohol and tobacco use.

Once SA M.B. noticed Appellant's profile, he established a military link to Appellant. On 20 May 2023 at 1519, SA M.B. messaged Appellant using "Chloe's" profile, saying "hi."[4] Appellant promptly responded inquiring whether "Chloe" was on the main island. "Chloe" did not respond to Appellant until 2105 confirming her location was on the main island.

Appellant asked "Chloe" if she wanted to "meet up."[5] To which SA M.B. replied with a controlled cell phone number for Appellant to message "Chloe" outside the HILY application.[6] At 2107, using the number provided, Appellant texted "Chloe" confirming he was in the military and inquired again about meeting up. At 2111, the following conversation took place:

> SA M.B.: hey jus wanna b clear tho. Not my profile age
>
> Appellant: How old are you?
>
> SA M.B.: almos 15
>
> SA M.B.: that ok
>
> Appellant: um

---

[3] R. at 751.

[4] R. at 768, 772.

[5] Pros. Ex. 6.

[6] R. at 773.

Appellant: No

Appellant: why u lie

SA M.B.: just looking for fun

Appellant: Your 14

SA M.B.: ya

Appellant: Sooo no I not risking my carrer[7]

At 2120, "Chloe" then replied, "lol okie. ill be here."[8] SA M.B. later testified at trial that this reply message was an "off ramp," a way for Appellant to "break from the conversation."[9] Rather than terminating the conversation, Appellant reengaged asking "Chloe" "what u evening doing up."[10] Following a brief exchange of texts, "Chloe" asked if Appellant would show her around the island. Appellant then responded, "I want to but u underage," prompting "Chloe" to ask "wats wrong w that."[11] Appellant replied, "It's illegal."[12]

At 2130, "Chloe" inquired whether Appellant was near Schofield Barracks. At 2131, less than 20 minutes after Appellant acknowledged "your 14," Appellant internet searched "how far is Schofield Barracks from me?"[13] and requested "Chloe" send a picture of herself at the moment, meaning "right now."[14] SA M.B. then sent Appellant a decoy picture. SA M.B. testified it was typical for a suspect to ask for photographs "at the moment" or video calls in order to know that it "really is the girl in the photographs, in the profile."[15]

Once Appellant received the photo, he immediately made attempts to call "Chloe" on the phone. Before speaking on the phone with Appellant, SA M.B.

---

[7] Pros. Ex. 7 at 1.

[8] Pros. Ex. 7 at 1.

[9] R. at 780-81.

[10] Pros. Ex. 7 at 1.

[11] Pros. Ex. 7 at 1.

[12] Pros. Ex. 7 at 1-2.

[13] Pros. Ex. 17.

[14] R. at 783-84.

[15] R. at 784; R. at 952; R. at 966.

briefed the decoy, SA E.W., who also served as "Chloe's" voice, that their conversations "got past age, but not sex."[16] At trial, SA E.W. explained the operational methodology, "once the suspect brings up sex first, whatever level of sexual promiscuity that person brings up, we're able to match it."[17]

At 2142, the first phone conversation took place between Appellant and "Chloe." During the phone call, SA E.W. provided another "off ramp," saying "if you don't want to have fun with me, that's okay."[18] To which Appellant responded, "I'd rather just talk to you in person, and nothing happens," reiterating he "just wanted to talk" three separate times on the call.[19] Additionally, it was during this conversation that Appellant learned that "Chloe" was home alone as her parents were staying at a hotel in Honolulu. At no point during the first phone call did either Appellant or SA E.W. discuss any sexual activity.

At 2208, Appellant and SA E.W. had a second phone conversation. During this phone call, Appellant initially mentioned the possibility of sexual activity by saying, "I have condoms." Although, he immediately followed up with "but I don't know about doing all that."[20] Despite expressing hesitation, Appellant still continued the conversation with "Chloe." The following conversation ensued:

> SA E.W.: So you're gonna bring the condoms with you?
>
> Appellant: I don't know.
>
> SA E.W.: You just said you have condoms so are you going to bring them?
>
> Appellant: Maybe.
>
> SA E.W.: Well, I'm not interested in anything if you're not using a condom.
>
> Appellant: Well, I'll bring it.
>
> SA E.W.: Okay. Do you want to use it?
>
> Appellant: You tell me.

---

[16] R. at 956.

[17] R. at 961.

[18] App. Ex. CXXXI at 2.

[19] App. Ex. CXXXI.

[20] App. Ex. CXXXII at 3.

SA E.W.: I don't know you. . . . That's why I'm asking you. But you're playing, like, these games and stuff. . . .

Appellant: We could hang out all night. Do stuff like that.

SA E.W.: Yeah but I don't want to like – I don't know what hang out means. Like what are you trying to do because if you come over here, like I need to know if you're trying to do something crazy because I'm not interest in, like, crazy stuff.

Appellant: Are you trying to sleep with me?

SA E.W.: What?

Appellant: Are you trying to sleep with me?

SA E.W.: I'm just trying to figure out what you're trying to do.

Appellant: Not much. I'll send you a picture. Also send me your snap. . . . [21]

After the phone call, at 2216, Appellant sent "Chloe" a video of a naked woman from the waist down and texted, "tryna get sum like this . . . . do u want to f\*\*k?"[22] Appellant continued the text conversation:

SA M.B.: ya wat u wanna do

Appellant: Ig let's do it send ur addy

SA M.B.: lol tell me wat u wanna do first

SA M.B.: ion want too many surprises

Appellant: I just said I'm bringing condoms aka f\*\*k

SA M.B.: lol ya I mean like how u wanna f\*\*k

Appellant: idk I will just do it

SA M.B.: so just f\*\*k or other stuff??

Appellant: F\*\*k

SA M.B.: sounds good[23]

Following this exchange, Appellant then made three unsuccessful attempts to video call "Chloe." SA E.W. answered the next video call as "Chloe" but kept her camera off so that Appellant would be unable to see SA E.W. Appellant

---

[21] App. Ex. CXXXII at 4-5.

[22] Pros Ex. 7 at 3.

[23] Pros Ex. 7 at 3.

requested she turn on her video so he could "trust" it's "Chloe."[24] "Chloe" requested to video call Appellant back. At 2241, during the next video call, SA E.W. appeared on camera as "Chloe" in a dimly lit room. Although Appellant requested that "Chloe" turn on the light, SA E.W. did not comply; nevertheless, Appellant confirmed his plans to come see her. Afterwards, in response to "Chloe" informing Appellant that she intended to take a shower, Appellant responded, "wait to shower so we can shower together."[25]

Around that same time, Appellant returned to his barracks room. His roommate testified that Appellant came home, grabbed a sweater, and said, "I'll be back. I'm going to go f**k this b***h."[26] Appellant ordered an Uber and traveled approximately 45 minutes to "Chloe's" house. Around midnight, Appellant arrived. In actuality, "Chloe's" house was an Army CID staging house used to apprehend suspects during the OKS-18 sting operation. Upon his arrival, Appellant was apprehended by the arrest team. A subsequent search of his person revealed a box of condoms in his pocket.

The case was then referred to the Naval Criminal Investigative Service (NCIS) and a follow-on NCIS investigation ensued. During the NCIS investigation, Appellant's cell phone extraction showed a single text message – "almos 15" – deleted from his messages with "Chloe."[27]

All other relevant facts are incorporated below.

## II. DISCUSSION

Appellant's consolidated assignment of error is that the evidence presented at trial was legally and factually insufficient to overcome the defense of entrapment. Specifically, Appellant argues that the Government failed to disprove inducement or demonstrate predisposition. For its part, the Government contends that there was overwhelming evidence indicating Appellant was not induced to commit the offense, and that he was predisposed to do so. We agree with the Government and are not convinced Appellant was entrapped and find his convictions both legally and factually sufficient.

---

[24] R. at 966.

[25] Pros. Ex. 7 at 4.

[26] R. at 1179.

[27] R. at 1076-78, 1103.

**A. The Evidence is Legally Sufficient to Sustain Appellant's Convictions.**

*1. Applicable Law*

Courts of Criminal Appeals "may affirm only such findings of guilty as the Court finds correct in law . . . ."[28] and will apply a de novo review.[29] To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[30] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[31]

*2. Attempted Sexual Assault of a Child*

To sustain the conviction of attempted sexual assault of a child in violation of Article 80, UCMJ, the Government must have proven beyond a reasonable doubt that: (1) Appellant did a certain overt act; (2) the act was done with the specific intent to commit sexual assault of a child under Article 120b(b), UCMJ; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the intended offense.[32] The elements of sexual assault of a child under Article 120b(b), UCMJ, are that (1) Appellant committed a sexual act upon a child;[33] and (2) the child had attained the age of 12 years, but had not attained the age of 16 years.[34]

---

[28] 10 U.S.C. § 866(d)(1)(A).

[29] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[30] *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014) (citing *United States v. Bennitt*, 72 M.J. 266, 268 (C.A.A.F. 2013)).

[31] *United States v. Robinson*, 77 M.J. 294, 298 (C.A.A.F. 2018) (citation omitted).

[32] 10 U.S.C. § 880.

[33] "The term 'sexual act' means (A) the penetration, however, slight, of the vulva or penis or anus of another by any part of the body or any object, with an intent to . . . arouse or gratify the sexual desire of any person; or (B) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to . . . arouse or gratify the sexual desire of any person. 10 U.S.C. §§ 920(g)(1)(A)-(B).

[34] 10 U.S.C. § 920b(b).

In order for an act to amount to more than mere preparation, it must be "conduct strongly corroborative of the firmness of the defendant's criminal intent," or a "substantial step" towards completing the offense.[35] To be a substantial step, the conduct "must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances."[36] Traditionally, travel generally constitutes a substantial step for child sex offenses, but "is not a sine qua non of finding a substantial step."[37]

We find the Government clearly established all the elements of attempted sexual assault of a child. The evidence of Appellant's intent was conclusive, as he not only told "Chloe," a fictitious persona he believed to be a 14-year-old, his intentions were to "f**k," but also told his roommate that he was going "to go f**k this b***h" before leaving his barracks room. Further, Appellant traveled by Uber approximately 45 minutes, with a box of condoms to "Chloe's" house. Traveling 45 minutes coupled with bringing condoms is a clear "substantial step" toward completing the offense. Considering this evidence presented at trial in the light most favorable to the prosecution, a reasonable fact finder could have found all the elements beyond a reasonable doubt.

### 3. Attempted Sexual Abuse of a Child Involving Indecent Communication[38]

In order to sustain a conviction of attempted sexual abuse of a child involving indecent communication in violation of Article 80, UCMJ, what the Government must have proven beyond a reasonable doubt remains the same as above. However, the elements of sexual abuse of a child under Article 120b(c),

---

[35] *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (cleaned up).

[36] *Id.* (quoting *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007)) (cleaned up).

[37] *Id.*; *see, e.g., United States v. Olaya*, No. 201900211, 2020 CCA LEXIS 413 at *5 (N-M. Ct. Crim. App. Nov. 16, 2020) (unpublished).

[38] We acknowledge the military judge conditionally dismissed this specification; however, Appellant raised this in his brief and the entrapment argument applies coterminously with both specifications. *See* Appellant's Brief at 13.

UCMJ are that: (1) Appellant committed a lewd act[39] upon a child by intentionally communicating to her indecent language,[40] (2) at the time, the child had not attained the age of 16 years; and (3) Appellant did so with the intent to arouse or gratify the sexual desire of any person.

We find the Government clearly established all the elements of attempted sexual assault of a child. The Government introduced recordings of all calls as well as Appellant's cell phone extraction where Appellant acknowledged "Chloe" was 14 years old, then continued to communicate with her including: "do you want to f\*\*k, ig let's do it send ur addy, I just said I'm bringing condoms f\*\*k, f\*\*k, and wait to shower so we can shower together." This indecent language was made with an intent to gratify Appellant's sexual desires.

### 4. Entrapment

Entrapment is an affirmative defense that "the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."[41]

> The defense has the initial burden of going forward to show that a government agent originated the suggestion to commit the crime. Once the defense has come forward, the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense prior to first being approached by Government agents.[42]

At trial, the military judge found that the evidence had raised the affirmative defense of entrapment, and he instructed the members the Government had the burden to prove that the Appellant was not entrapped.

---

[39] The term "lewd act" is defined, in part, as "intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person." 10 U.S.C. § 920b(g)(5)(C).

[40] The term "indecent language" is language that is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards. *Manual for Courts Martial, United States* (*MCM*), pt. IV, para. 106.c. at IV-135.

[41] R.C.M. 916(g).

[42] *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (cleaned up).

a. Inducement

For the government to entrap someone, it must first engage in some form of inducement.[43] This occurs when a government actor goes beyond merely providing the "opportunity or facilities to commit the crime" and instead "creates substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense."[44] Inducement can take many forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.[45] Simply offering the opportunity or using trickery and stratagems does not constitute inducement.[46] Further, repeated requests "do not in and of themselves constitute the required inducement."[47]

In this case, the undercover agent operating as "Chloe" initiated contact with Appellant via the HILY application, texting him "hi" that afternoon. At that time, Appellant had no indication that "Chloe" was underage. Appellant responded by asking "Chloe" if she was "on the main island." "Chloe" did not respond until later that evening at 2105 and requested to transfer the communication from HILY to text messaging. Shortly thereafter, "Chloe" disclosed that she was 14 years old via text message.

Appellant immediately expressed hesitation, prompting the undercover agent to offer him the first off-ramp stating, "lol okie. ill be here." However, Appellant did not take the off-ramp, instead he chose to continue on the highway and quickly began to accelerate his actions. Approximately 3 hours later, Appellant would find himself apprehended after taking a 45-minute Uber ride to "Chloe's" residence, with a box of condoms in his pocket, intending to have sexual intercourse with a 14-year-old whose parents were not home.

Appellant's sole argument is that the evidence is insufficient to prove beyond a reasonable doubt that he was not entrapped. We disagree. The evidence clearly demonstrates that Appellant sought to engage in sexual activity with a 14-year-old child. Although Appellant claims in his brief that he initially

---

[43] *Id.* (citing *United States v. Howell*, 36 M.J. 354, 359-60 (C.M.A. 1993).

[44] *Id.* at 436-37.

[45] *Id.* at 436.

[46] *See generally United States v. Vance*, No. 202100024, 2022 CCA LEXIS 374 (N-M. Ct. Crim. App. June 22, 2022).

[47] *Hall*, 56 M.J at 437 (internal quotation marks omitted).

sought only "platonic"[48] interactions with "Chloe," a thorough review of the conversations in the record revealed that his intent was to use those seemingly innocent exchanges to verify "Chloe's" identity and then proceed to sexual activity.

Notably, the communications between Appellant and the undercover agents did not show any coercion, threats, or harassment, nor did they involve the kind of pressure or persuasion necessary to establish entrapment. The comments about "having fun," "hanging out," or similar vague terms used were open to interpretation and could mean various things. Based on our review of the record in this case, it is clear to us that Appellant interpreted and validated these terms based on his own interests.

In essence, the interactions Appellant had with law enforcement in this case are not close to establishing the persuasion necessary in the mind of an "innocent individual" to commit the crimes. Here, the evidence shows that there were only opportunities for Appellant to commit the offenses for which he was predisposed to commit.

### b. Predisposition

Additionally, there was sufficient evidence before the members that Appellant was predisposed to commit the offenses.

"The question of predisposition relates to a law-abiding citizen. A law-abiding person is one who resists the temptations, which abound in our society today, to commit crimes."[49] Entrapment "does not require law enforcement agents to have evidence of a defendant's criminal activity before approaching the defendant."[50] "Evidence that 'a person accepts a criminal offer without being offered extraordinary inducements . . . demonstrates his predisposition to commit the type of crime involved.'"[51]

Here, we find no extraordinary inducements. To the contrary, there was credible evidence that Appellant was predisposed to commit the offenses. After "Chloe" revealed she was 14, a person who had no predisposition to commit the offenses could have just blocked her or ceased contact. Instead, Appellant continued the conversation, which eventually led Appellant to discussing, and acting on, his sexual intentions. Notably, we find it telling that here, Appellant

---

[48] Appellant's Brief at 18.

[49] *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992).

[50] *United States v. Bell*, 38 M.J. 358, 360 (C.M.A. 1993).

[51] *Id.* (quoting *United States v. Evans*, 924 F.2d 714, 718 (7th Cir. 1991)).

reinitiated communication with "Chloe" after being offered "off-ramps" and time, especially during a 45-minute Uber trip, to reconsider the decisions he was making. In our view, this is a strong indication of his predisposition to commit the offenses at issue here.

Less than 20 minutes after learning "Chloe's" age, Appellant requested a picture of her "at the moment." Seconds after receiving it, he ramped up his pursuit by attempting to call "Chloe" on the phone. His initial efforts of a phone call were unsuccessful until the decoy agent was ready and available to speak to Appellant on the phone. Then, just over an hour after discovering "Chloe's" age, Appellant was the first to bring up sexual activity stating, "I have condoms, but I don't know about doing all that." About one minute after this comment, however, Appellant sent a video of a naked woman with a text message, "tryna get sum like this," At this point, Appellant's intent was made clear, he wanted to have sexual intercourse with "Chloe."

Before confirming his plans to visit "Chloe's" home, Appellant sought a video call in an effort to "trust" that "Chloe" was really who she said she—a 14-year-old girl. Once Appellant received sufficient verification, he then carried out his plan, taking a 45-minute Uber ride. Before getting in the Uber, he obtained a box of condoms and expressed to his roommate his intent, which was "I'm going to go f*** this b***h."

Throughout the conversation, Appellant expressed hesitation citing fears of risking his career and the illegality associated with his intentions. This is strong evidence that his hesitations during initial communications stemmed from fear of apprehension, not the lack of predisposition.

### 5. Conclusion

We find Appellant's conviction for these offenses to be legally sufficient. Under the highly deferential standard for legal sufficiency in which we must draw all inferences in favor of the prosecution, a reasonable finder of fact could have found all elements beyond a reasonable doubt.

## B. The Evidence is Factually Sufficient to Sustain Appellant's Convictions.

### 1. Applicable Law

This "Court may consider whether a finding of guilty is correct in fact upon request of an appellant who makes a specific showing of a deficiency in proof."[52] If an appellant makes such a showing, this "Court may weigh the evidence and

---

[52] Art. 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B).

determine controverted questions of fact," providing "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence."[53] If this Court is "clearly convinced that the finding of guilty was against the weight of the evidence," the Court "may dismiss, set aside, or modify the finding, or affirm a lesser finding."[54]

*2. Analysis*

Appellant contends questions of fact exist relating to the Government's failure to prove beyond a reasonable doubt that Appellant was not entrapped. Specifically, Appellant, relying on his argument *supra*, asserts that the Government did not prove Appellant was not induced and did not prove he was predisposed to commit the offenses. We find that Appellant has made a specific showing of a deficiency of proof.[55] We acknowledge and provide appropriate deference to the fact the trial court saw and heard the witnesses.[56] We also listened to the same recording of Appellant's phone and video calls as the finders of fact.

The Government presented a compelling case, and the weight of the evidence overwhelmingly supports the finding that Appellant attempted to sexually assault and sexually abuse a child. Specifically, the evidence shows that law enforcement effectively utilized "off-ramps" that Appellant ignored. Instead, he initiated messages of a sexual nature, sought proof "Chloe" was a minor by requesting photos of her "at the moment," conducted phone and video calls to verify her identity, and then traveled over 45 minutes with a box of condoms to "Chloe's" residence, believing she was home alone, intending to engage in sexual intercourse. This all occurred within approximately 3 hours from the time Appellant learned "Chloe's" age to be 14.

We have no hesitation in concluding that the Government proved beyond a reasonable doubt not only the elements of the offenses but also that Appellant was not induced, was predisposed to commit these offenses, and that he was, therefore, not entrapped. Accordingly, we are not convinced, let alone clearly convinced, the findings of guilt in this case were against the weight of the evidence.

---

[53] 10 U.S.C. § 866(d)(1)(B)(i)(I).

[54] 10 U.S.C. § 866(d)(1)(B)(iii); *See United States v. Harvey*, 85 M.J. 127 (C.A.A.F. 2024); *United States v. Csiti*, 85 M.J. 414 (C.A.A.F. 2025).

[55] Appellant's Brief at 22-23.

[56] *Harvey,* 85 M.J. at 130-31.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[57]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[57] Articles 59 & 66, UCMJ.